**MARIATIGUI, KNIGHT & CO. *vs.* LOUISIANA INSURANCE CO.**

APPEAL FROM THE COURT OF THE FIRST JUDICIAL DISTRICT.

Where acts of barratry of the master and mariners were committed, by smuggling on board articles prohibited by the revenue laws, and which were seized on the landing of the vessel, but she is not seized until more than twenty-four hours after landing at her port of destination: *Held,* that the insurers were not liable for the *barratry,* although insured against, when, according to the terms of the policy, the vessel was *moored twenty-four hours in good safety,* before seizure.

Although the loss of the vessel was the immediate consequence of seizure, the remote cause of which was the *barratry* of the master and mariners, the effects of which were insured against, yet, as no loss resulted until after the vessel had been moored twenty-four hours, *before seizure,* she may be considered as in safety, *quo ad* the responsibility assumed by the insurers.

Mooring in good safety, is defined to be the placing a vessel in a situation to unload her cargo: no loss of the vessel prevented the landing of any

EASTERN DIST.
March, 1835.

MARIATIGUI,
KNIGHT & CO.
vs.
LA. INS. CO.

goods on board, except those smuggled. It is the loss for which the insurers promised indemnity, which was neither *inchoate* or *final* by any proceeding directly touching the vessel, prior to her being moored twenty-four hours in safety.

This is an action to recover six thousand dollars from the defendants, being the amount of insurance effected on the brig Primero de Mahon, belonging to the plaintiffs and insured in the office of the Louisiana Insurance Company, at and from Havana, to New-Orleans, and seized and forfeited in the latter port, on account of the barratry of the captain and mariners, in introducing rum in demijohns and Spanish segars in boxes, in violation of the revenue laws.

The plaintiffs reside and transact commercial business in Havana, and were the owners of the Spanish brig Primero de Mahon. On the 14th of August, 1832, W. W. Caldwell, a member of the plaintiff's firm, took out a policy of insurance, at the office of the defendants, on said vessel, which was valued at six thousand dollars, and insured " at and from the port of New-Orleans to Havana, and *at and from Havana to New-Orleans, until she be moored twenty-four hours in good safety.*" The insurance was against the perils of the seas, *barratry of the master and mariners, &c.* The brig sailed under Spanish colors. On her return voyage, and *within* twenty-four hours after she landed at the port of New-Orleans, there was discovered and concealed in her, a quantity of demijohns of rum, and Spanish segars in boxes, which were immediately seized by the custom-house officers. The vessel arrived in port on the evening of the 12th of September, 1832, and had on board twelve demijohns of rum and two hundred and forty boxes of Spanish segars, belonging to the boatswain, with the knowledge of the other officers. These articles were seized immediately, and on the 15th of of September the vessel was seized and finally condemned for having smuggled in the rum and segars, in violation of the revenue laws.

The district judge considered the law as settled, which must govern this case. The rule is established that the insurer is not liable for a *loss* which occurs after the expi-

ration of twenty-four hours safe mooring in the port of her destination, even though she may have received her death wound previously, and during the time she was insured.

Judgment was rendered in favor of the defendants. The plaintiffs appealed.

EASTERN DIST.<br>
<i>March,</i> 1835.

MARIATIGUI,<br>
KNIGHT & CO.<br>
<i>vs.</i><br>
LA. INS. CO.

*Maybin and Hennen,* for the plaintiffs, contended, that the brig Primero de Mahon was libelled by the United States, within twenty-four hours after she was moored at the levee. What constitutes a mooring? *See Webster's Dictionary, verbo Mooring.* 15 *Common Law Reports,* 162. 5 *Martin, N. S.* 637.

2. That if she was not so libelled, the smuggling was discovered by the officers of the customs almost immediately on her arrival, within two hours at the farthest, and before she was hauled to the levee, and the goods were seized by the officers, and the vessel was therefore immediately forfeited to the United States, and the ownership of the plaintiffs divested 8 *Cranch,* 398, 417. 3 *Wheaton,* 311. 11 *Johnson,* 293.

3. By the act of Congress, March 2d, 1799, section 103, the vessel is forfeited in which the prohibited goods shall be imported. There was clearly an importation in this case. 1 *Mason,* 482. 1 *Peters's C. C. Reports,* 256. 1 *Gallison,* 206, 239, 348, 365. 9 *Cranch,* 104.

4. The case in 1 *Term Reports,* 252, of *Lockyer* vs. *Offley,* was not decided by Lord *Mansfield,* but by the three judges of the King's Bench, and is distinguishable by its circumstances from the present. It is founded on no authority but the case of Meretonz *vs.* Dunlope, which is questioned by Chief Justice Tilghman. *See* 3 *Sergeant and Rawle,* 21.

5. The principle upon which this case rests is shaken, if not opposed, by several adjudged cases in the United States. *See Massachusetts Reports,* 1. 3 *Johnson's Reports,* 16. *Pickering's Cases,* 210. 2 *East,* 110. 15 *Ibid.,* 45.

*Strawbridge, contra.*

*Mathews, J.,* delivered the opinion of the court.

In this case the plaintiffs claim six thousand dollars, an amount which is alleged to have been insured on the brig

Eastern Dist.
March, 1835.

Mariatigui,
Knight & co.
vs.
La. Ins. co.

Primero de Mahon, by the defendants. Judgment was rendered in favor of the latter, in the court below, from which the former appealed.

The principal facts requiring notice in the decision of the case, as disclosed by the pleadings and evidence, are the following: The insurance was effected on the vessel at and from New-Orleans to Havana, and at and from the latter place to New-Orleans, and until she be moored twenty-four hours in good safety. Amongst other risks assumed by the insurers, was that of barratry which might be committed by the master and mariners, &c. Acts of barratry were committed by the master or mariners, in attempting to smuggle into the latter port certain demijohns of rum and boxes of segars, (in violation of the revenue laws of the United States,) which were seized by the officers of the custom-house, immediately on the arrival of the brig, late in the day, on the 12th of September, 1832. But the vessel was not seized until the 15th of that month, and not until after she had been moored more than twenty-four hours.

The correctness of the judgment rendered by the court below, depends solely on a solution of the question, whether the vessel, under all the circumstances attendant on her arrival and mooring, must be considered as having remained in safety from the period when she was moored until actual seizure by the marshal, under process instituted at the instance of the collector of the port, or at least during twenty-four hours after mooring.

It is clear from the evidence, that acts of barratry sufficient to cause a forfeiture had been committed, and were known to have been committed previous to the time at which this risk had ceased, as assumed in the policy of insurance. A legal consequence of the barratrous conduct of the master, in a prosecution to that effect, was the condemnation and forfeiture of the vessel; and that such prosecution would take place, was rendered in a very high degree probable, from the circumstance of the act of smuggling being known to the custom-house officers so immediately after the arrival

*Where acts of barratry of the master and mariners were committed, by smuggling on board articles prohibited by the revenue laws, and which were seized on the landing of the vessel, but she is not seized until more than twenty-four hours after landing at her port of destination: Held, that the insurers were not liable for the barratry, although insured against, when according to the terms of the policy, the vessel was moored twenty-four hours in good safety, before seizure.*

*Although the loss of the vessel was the immediate consequence of seizure, the remote cause of which was the barratry of the master and mariners, the effects of which were insured against; yet as no loss resulted until after the vessel had*

of the brig. The loss of the vessel was, however, the imme-
diate consequence of its seizure and condemnation. It is
true, the remote cause of loss was the barratry of the master,
against the effects of which the owners were insured ; but it
produced no effect which may be considered as resulting in
loss, until after the vessel had been moored more than
twenty-four hours ; and before actual seizure she may be
considered as having been in safety, *quo ad* the responsibility
assumed by the insurers in their policy. Mooring in good
safety, is defined to be the placing of a vessel in a situation
to unload her cargo ; and this, as shown by the evidence,
was the situation of the brig in question, for as no forfeiture
attached to any of the goods on board, except those smuggled,
there was nothing to prevent them from being landed. It is
the loss for which the insurers promised indemnity ; and it
was neither *inchoate* nor *final* by any proceeding directly
touching the brig, prior to her being moored twenty-four
hours ; and immediately after that period the contract of
insurance had expired by its own limitation, as no contract
then existed covering the property ; for the owners *res perit
domino.*

These principles are supported by the decision of the Court
of King's Bench in England, in the case of Lockyer et al. *vs.*
Offley, 1 *T. R.* 252, and the doctrine therein established has
been transcribed into authors on insurance. See *Hughes, pp.*
190, 191. *Marshal,* 533. 3*d Kent's Com.,* 253, *et al.*

But it is contended for the plaintiffs, that the doctrine
established by the case cited from 1 *Term Reports,* has been
overruled by subsequent decisions, in proof of which we have
been referred to a variety of cases decided both in the courts
of England and the United States. See 2 *East,* 109. 15
*do.,* 45. 15 *Common Law Reports,* 160. 3 *Johnson's Law R.*
16. 11 *Johnston,* 293. 7 *Cranch,* 398 *and* 417. 3 *Wheaton,*
311, *&c.*

The decisions in most of these cases, were made in reference
to losses occasioned by physical causes, which had effected
the inevitable destruction of the property insured, within the
time limited in the policies. The judgments in these cases

Mariatigui Knight & co. *vs.* La. Ins. co.

been moored twenty-four hours, *before sei- zure,* she may be considered as in safety, *quo ad* the responsibility assumed by the insurers. Mooring in good safety, is defined to be the placing a vessel in a situation to unload her cargo : no loss of the vessel prevented the landing of any goods on board, except those smuggled. It is the loss for which the insurers promised indemnity, which was neither *inchoate* or *final* by any proceeding directly touching the vessel, prior to her being moored twenty-four hours in safety.

EASTERN DIST.
March, 1835.
‑‑‑‑‑‑‑‑
MARIATIGUI,
KNIGHT & CO.
vs.
LA. INS. CO.

do not, in our opinion, conflict with the principles laid down in that of Lockyer et al. vs. Offley, either in what was said or done; touching the facts and law of those cases. There is, however, another class of cases cited, on which the counsel for the appellants rely; and these cause some embarrassment in the decision of the present. They have relation to the doctrine of forfeiture, as inflicted on owners of vessels in consequence of violations done to public policy and order, by contravening the provisions of prohibition laws. The laws which governed in those cases, were denominated non-intercourse acts, passed by the Congress of the United States, and the expression used by which the forfeiture was ordained is, that the vessel *should be forfeited.* The expression in the revenue law, under which the brig in the present instance was condemned, is, *under pain of forfeiture.* Perhaps it would be difficult to draw any rational distinction by which the effects of these different modes of phraseology might be varied. In the decisions of the cases cited, the only question determined was one which affected directly the property of the owners, and it was declared that a transfer took place, immediately and *ipso facto,* by the commission of the offence, to the United States. This opinion must have been founded on a fiction of law contrary to general principles relating to the transfer of the dominion of property, which can only be complete by delivery, or perhaps, by seizure, in forced alienations. For the purpose of preventing frauds on the government, by simulated transfers to other persons, after violation of its laws, by the owners, whereby their property may have been forfeited, the fiction which carries back the change from the time of condemnation to the period of the offence, may be considered as wisely and properly adopted. But this section ought not to be allowed to operate on contracts entered into *bonâ fide* previous to the act by which a forfeiture may be incurred, when such contracts have reference only to the use or preservation of the thing, for the benefit of the owner. It must, however, be confessed, that the doctrine now assumed appears to militate against that acted on in the case of Fontain vs.

Phœnix Insurance Company, (11 *Johnson*, 293.) But it is in strict conformity with the principles established by the decision of the case in 1 *Term Reports*, 252, wherein it was held that although a forfeiture may be considered as attaching at the moment the offence is committed, for some purposes; yet, in relation to a contract of insurance, the actual property is not altered until after seizure. A rule has grown out of this decision, which ever since seems to have been acquiesced in by all the authors who treat on the subject of insurance, in England and the United States, and remains (so far as we know) without exception, unless one may be found in the case cited from 11 *Johnson's Reports*.

It is, therefore, ordered, adjudged and decreed, that the judgment of the District Court be affirmed, with costs.